DOROTHY A. THOMPSON AND ANOTHER v. CARL SCHRAIBER, d.b.a. THE TORCH.

90 N. W. (2d) 915.

June 20, 1958—No. 37,435.

*Dorfman & Rudquist* and *John Ramstead,* for relator.

*Miles Lord,* Attorney General, and *George C. Gubbins, Jr.,* Assistant Attorney General, for respondent commissioner.

DELL, CHIEF JUSTICE.

Relator operates a tavern in Minneapolis. In September 1955 he hired claimant as a part-time waitress. She was to work 6 days a week from 8 a. m., when the tavern opened, until noon, for which she was to receive $1 an hour. Relator was also engaged in the real estate business and at certain times of the year, when he was required to be away from the tavern much of the time, he allowed claimant to work extra hours. At no time, however, did she put in a full-time week which, in accordance with the contract between relator and her union, was 48 hours.

In November 1956 relator's real estate activities decreased. He informed claimant that it would no longer be necessary for her to work additional hours and her working time was reduced to 4 hours a day according to the original working agreement. Early in 1957 a lack of early-morning business forced many Minneapolis taverns to open at 10 a. m. or at noon instead of at 8 a. m. Relator informed claimant that in the future he too might have to open later if business did not improve and, in fact, he did change his opening hour to 10 a. m. in April 1957. Prior thereto, when it became apparent to relator that he would have to change his opening hour, he told claimant that she might continue to work 2 hours a day in the morning from the time the tavern opened until noon and offered to let her work an additional 4 hours in the evening "three, four, five or six [nights a week], whatever nights she wanted" in order to make up the time she would lose. Because she had minor children whom she would not leave alone at home and for whom she claimed it was economically impractical to hire a sitter, she refused. She continued working about 2 hours a day after her hours were reduced and was still in relator's employ at the time of the hearing.

Claimant filed her initial claim for unemployment benefits on February 28, 1957—over a month before her hours were reduced—in anticipation of the cut in her working time. Relator objected to the payment of any benefits to her but a claims deputy found against him. He appealed this determination to an appeal tribunal in the Department of Employment Security which upheld the claims deputy upon the grounds that claimant was a full-time employee prior to November

1956; that she was able to work and available for work within the meaning of our statutes;[1] that her refusal to work the split shift was with good cause; and that she was therefore entitled to benefits. The representative of the commissioner of employment security affirmed the tribunal's decision, and relator petitioned this court for a writ of certiorari, which we granted.

The first question is whether or not claimant was able to and available for work. If she was not, then she is not entitled to any benefits. If she was, then it becomes necessary to consider whether or not she was a full-time employee in order to determine whether relator's experience-rating account is chargeable with any benefits which are paid to her.[2] We hold that claimant was not available for work within the meaning of our statute and hence is not entitled to benefits. Accordingly we need not pass upon the question of whether she was a full-time employee.

The instant case is governed by Swanson v. Minneapolis-Honeywell Regulator Co. 240 Minn. 449, 61 N. W. (2d) 526. In that case an employee was laid off from work through no fault of her own. When the employer offered her work commencing one-half to one hour earlier than her previous starting time, she refused it because it would interfere with her plans for taking care of her children, ages 5 and 8. We held that in order to fall within the statutory requirements of availability for work an employee must be unequivocally exposed to the labor market[3] and may not limit her availability because of personal or domestic reasons unrelated to her employment. Claimant's benefits were thus denied. All states which have had occasion to pass upon the question have reached the same result.[4]

Concededly these cases have all dealt with employees' self-imposed

---

[1]M. S. A. 268.08, subd. 1(3).

[2]See, § 268.06, subd. 5(1).

[3]And see, Leclerc v. Administrator, 137 Conn. 438, 78 A. (2d) 550.

[4]Decisions of courts and administrative bodies are so numerous that it would be superfluous to cite them here. They are collected in the respective Federal and state sections of CCH, Unemployment Ins. Rep. pars. 1950 and 1965, under "Domestic circumstances" and related headings.

restrictions either to certain hours[5] or to a certain shift.[6] In the latter instances it has been uniformly held that "when a person places herself in the labor market for a type of work where it is customary to work in shifts, she must be available for any shift."[7]

We know of no state in which the split-shift issue has come before the highest court. However, since the split shift was common in claimant's occupation,[8] we would be justified in relying solely upon the cited cases and holding that by refusing relator's offer claimant removed herself from the labor market. But we are not required to do so only on the basis of those cases. At least two lower courts have reached the same result in cases involving waitresses, holding that, where the split shift was an accepted employment practice, claimants who refused such an arrangement were not available for work.[9] We concur with those cases and with the decisions of the various state agencies which have denied benefits where the split shift is a normal practice[10] and is refused for

---

[5]Swanson v. Minneapolis-Honeywell Regulator Co. 240 Minn. 449, 61 N. W. (2d) 526; Robinson v. Maryland Employment Security Board, 202 Md. 515, 97 A. (2d) 300, and cases cited therein. Cf. Johnson v. Levy, 240 Minn. 502, 61 N. W. (2d) 845.

[6]Goings v. Riley, 98 N. H. 93, 95 A. (2d) 137, and cases cited therein.

[7]Ala. Bd. of App. Dec. No. 174, Dec. 31, 1943, 1A CCH, Unemployment Ins. Rep. (Ala.) par. 1950.74.

[8]Relator's contract with claimant's union contains the following provision: "The EMPLOYER agrees to eliminate the split watch in all departments as much as possible * * *." This provision is sufficient evidence of the prevalence of the practice, and there is also uncontradicted testimony in the record that: "* * * there is a lot of taverns that have girls that work on split shift. That is not nothing uncommon in the tavern business. * * * [The union business agent] told me people had girls working split shifts in taverns."

[9]Corey v. Office of Unemployment Comp. and Placement (Wash. Super. Ct.) Grays Harbor County, May 6, 1952, 8 CCH, Unemployment Ins. Rep. (Wash.) pars. 1950.343, 8211; Doerler v. Administrator (Conn. Super. Ct.) New Haven County, No. 70866, June 22, 1948, 2 CCH, Unemployment Ins. Rep. (Conn.) par. 1950.30.

[10]Ind. App. Trib. Dec. No. 39-A-715, Sept. 1, 1939, Unemployment Comp. Interpretation Service, Benefit Series (U. C. I. S.) Vol. 3, No. 3, p. 249 (case No. 3010).

purely personal reasons.[11]

It is true that certain administrative decisions have reached a different result but they are all distinguishable from the instant case. In two instances, the split shift was not the normal practice.[12] In two others, triple shifts were involved, one of which would have extended over an 18-hour period[13] and the other over 14 hours, including traveling time, because it would not have been feasible to return home between shifts.[14] The continuous absence from home for an excessive number of hours constituted good cause for refusing split-shift employment in still another two cases,[15] and special circumstances existed in the final one.[16] No extenuating circumstances are present in the instant case. Claimant's sole objection to night work is that it would require her to leave her minor children unattended or would require her to hire a sitter which she could not afford. The work was the same; the place of business was the same; the split shift was a recognized practice in this business. There was no necessity for her to be away from home for an excessive amount of time because the tavern was only two blocks from her residence. She had worked at night before when she was employed by this very same employer, but at that time a daughter, who is no longer at home, was

[11]Cal. App. Bd. Dec. No. 5622, Sept. 25, 1946, Benefit Series, U. C. I. S., Vol. 10, No. 2, p. 23 (case No. 11191); Fla. Dec. of App. Ref. No. 6017, July 20, 1950, Benefit Series Service Unemployment Insurance, 1950, SW-450.5-1.

[12]Mo. App. Trib. Dec. No. A-870, Jan. 16, 1940, Benefit Series, U. C. I. S., Vol. 3, No. 6, p. 292 (case No. 3716); Wis. App. Trib. Dec. No. 48-A-219, 8 CCH, Unemployment Ins. Rep. (Wis.) par. 1965.8132.

[13]Pa. Bd. of Rev. Dec. No. B-44-91-G-394, Jan. 24, 1945, Benefit Series, U. C. I. S., Vol. 8, No. 5, p. 126 (case No. 9448). The hours were 5 to 9 a. m., 4 to 5 p. m., and 9:30 to 11 p. m.

[14]N. Y. App. Bd. Dec. No. 26,784-51, May 18, 1951, N. Y. CCH, Unemployment Ins. Rep. par. 8780.11. The hours were 8 to 10 a. m., noon to 2 p. m., and 6 to 8 p. m., with one hour travel time each way.

[15]Kan. Dec. of App. Ref. No. 3202, Feb. 11, 1946, Benefit Series, U. C. I. S., Vol. 10, No. 3, p. 72 (case No. 11310); Utah Dec. of App. Ref. No. 42-A-147, Sept. 18, 1942, Benefit Series, U. C. I. S., Vol. 6, No. 5, p. 106 (case No. 7967).

[16]N. C. Dec. of Emp. Sec. Comm. No. 1572, June 22, 1949, Benefit Series, U. C. I. S., Vol. 12, No. 11, p. 120 (case No. 13870).

available to sit with the other children. We would work a great injustice if we were to subject employers to the task of conducting their businesses to suit the domestic necessities of each one of their employees. Claimant, therefore, cannot be said to be available for work within the meaning of our statute.

One final observation should be made. Claimant not only has restricted her hours, which in itself would have sufficed to deny her any benefits,[17] but she has also apparently failed to seek employment in any establishment but relator's. Such a severe limitation may not be used as an excuse to enjoy the benefits to be derived both from wages earned for work done solely at claimant's convenience and from unemployment compensation. "In view of all the [self-imposed] restrictions placed on her availability, it must be held that claimant is not available for suitable work and cannot be deemed eligible for benefits under the Law."[18]

Reversed.

---

[17]Swanson v. Minneapolis-Honeywell Regulator Co. 240 Minn. 449, 61 N. W. (2d) 526; Robinson v. Maryland Employment Security Board, 202 Md. 515, 97 A. (2d) 300. And see, Mo. Dec. of Unemp. Comp. No. C-1403, Sept. 21, 1944, Benefit Series, U. C. I. S., Vol. 8, No. 2, p. 99 (case No. 9166).

[18]Minn. App. Trib. Dec. No. 1244-B-55, Oct. 20, 1955, 5 CCH, Unemployment Ins. Rep. (Minn.) par. 8199.